IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA ) CAUSE NO. 4:09-MJ-205-BE
(
vs. )
( AUGUST 25, 2009
) DALLAS, TEXAS
THOMAS L. GERRY, et al ( 9:30 A.M.

DETENTION HEARING

BEFORE THE HONORABLE CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
801 CHERRY STREET, SUITE 1700
FORT WORTH, TEXAS 76102
BY: MR. FREDERICK SCHATTMAN

FOR THE DEFENDANT: FEDERAL PUBLIC DEFENDER
(GERRY) 819 TAYLOR STREET, ROOM 9A10
FORT WORTH, TEXAS 76102
BY: MR. MATT BELCHER

FOR THE DEFENDANT: MR. LEON HALEY, JR.
(ANDERSON) 1319 BALLINGER STREET
FORT WORTH, TEXAS 76102

FOR THE DEFENDANT: (HOLT)
MR. ANDREW OTTAWAY
301 S. MORGAN
GRANBURY, TEXAS 76048

FOR THE DEFENDANT: (NANCE)
MR. RODERICK WHITE
316 HEMPHILL STREET
FORT WORTH, TEXAS 76104

OFFICIAL COURT REPORTER:
SHAWN M. McROBERTS, RMR, CRR
1100 COMMERCE STREET, RM. 1654
DALLAS, TEXAS 75242
(214) 753-2349

# INDEX

**EXAMINATION**


| Witness Name | Page |
|---|---|
| RONNIE ROBINSON | |
| Direct By MR. SCHATTMAN | 6 |
| Cross By MR. HALEY | 24 |
| Cross By MR. OTTAWAY | 30 |
| Redirect By MR. SCHATTMAN | 31 |
| Recross By MR. HALEY | 32 |
| FRANCES CLOUGH | |
| Direct By MR. HALEY | 38 |
| Cross By MR. SCHATTMAN | 52 |
| Redirect By MR. HALEY | 54 |

THE COURT: Thank you. Please be seated.

We are here in regard to the United States versus Thomas Lloyd Gerry, Herbert Philip Anderson, John Reginald Holt, and Miyoshia Wylynn Nance.

And Ms. Krambeck?

DEFENDANT KRAMBECK: Here.

THE COURT: Your attorney yesterday afternoon asked for a continuance because he is in trial, and we had continued your case until 1:30 tomorrow. And Leigh Davis is your attorney, and he is good, and he will talk with you before the hearing. In any event, I am sorry you were not informed about that.

Do you have any questions?

THE DEFENDANT: I have no questions regarding this issue at this particular time.

THE COURT: Very well. In any event, in connection with these four cases set for preliminary hearing and detention hearing, is the Government ready?

MR. SCHATTMAN: The Government is ready, Your Honor.

THE COURT: And are the Defendants ready?

MR. BELCHER: Yes, Your Honor.

MR. HALEY: Yes, Your Honor.

MR. OTTAWAY: Yes, Your Honor.

MR. WHITE: Ms. Nance is not prepared, Your Honor. We would request a continuance.

THE COURT: Until when, Mr. White?

MR. WHITE: The early part of next week or late this week.

THE COURT: It would be this week. You are entitled to up to five days continuance from first appearance. First appearance was Friday.

THE CLERK: It was Thursday.

THE COURT: It was Thursday? I will trust my courtroom deputy. How would tomorrow at 1:30 be?

MR. WHITE: We would request a little bit longer, Your Honor, but we will do everything we can to be prepared tomorrow at 1:30.

THE COURT: I would certainly prefer tomorrow at 1:30, if you can at all be ready for that.

MR. WHITE: We will do everything we can, Your Honor.

THE COURT: Very well. Thank you, Mr. White.

Then the case involving Ms. Nance is continued until tomorrow at 1:30. And Mr. White, you are excused.

And Mr. Schattman, you may proceed with the other cases.

MR. SCHATTMAN: Okay. Your Honor, first --

THE COURT: Oh, I am sorry. Hi, Mr. Boone. The courtroom deputy said we need to take care of you, and I wasn't seeing you. But in any event, you are relieved of further duties. Thank you for being here. Leon Haley has

entered his appearance on behalf of Mr. Anderson.

It is good to have you, Mr. Haley.

And thank you, Mr. Boone. You are excused.

Now, Mr. Schattman, you may proceed.

MR. SCHATTMAN: We would ask the Court to take notice of the court Pretrial Services officer and call Special Agent Ronnie Robinson.

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Please have a seat on the witness stand.

RONNIE ROBINSON,

Testified on direct examination by Mr. Schattman as follows:

Q. Tell us your name, please.

A. My name is Ronald Robinson.

Q. Mr. Robinson, how are you employed?

A. I am employed as a special agent with the Drug Enforcement Administration stationed here in Fort Worth, Texas.

Q. How long have you worked for the DEA?

A. Approximately 20 years.

Q. All right. During the course of your duties with the Drug Enforcement Administration, have you had occasion to participate in a criminal investigation that has resulted in filing of a criminal complaint in this case?

A. Yes, sir, I did.

Q. And you were one of two case agents on that case.

Correct?
A. That is correct, sir.
Q. All right. Let's begin, sir, with the Defendant Thomas Lloyd Gerry. Can you just give us a brief overview of what the investigation disclosed with regard to Mr. Gerry?
A. Yes, sir. Beginning in mid 2008, my office here in Fort Worth received information regarding a methamphetamine or ice methamphetamine tracking activities of Mr. Gerry. This information indicated that Mr. Gerry was receiving on a regular basis multi-pound quantities of methamphetamine at his residence there in Bedford, Texas. And from that point Mr. Gerry was employing numerous individuals who acted as distributors for him.
Methamphetamine was then being sold and Mr. Gerry had formed a company identified as Hammer Time Custom Remodeling, and that he was also participating with Mr. Andy Anderson in a couple of adult entertainment businesses in Arlington, and these businesses, along with the Hammer Time Custom Remodeling, was used to launder part of the drug proceeds.
Q. All right. And did you all take steps to try to confirm any of that information?
A. Yes, sir, we did.
Q. All right. Now, as to Mr. Gerry, early in the investigation did you have the cooperation of an informant who knew Mr. Gerry?

A. Yes, sir, I did.
Q. And at you all's instruction and request, did the informant purchase narcotics -- not narcotics. Methamphetamine at Mr. Gerry's residence at 2116 San Fernando Street?
A. That is correct. Myself and the confidential informant went to Mr. Gerry's residence and entered the residence and purchased two ounces of methamphetamine from Mr. Gerry and Mr. John Holt.
Q. All right. Speaking of Mr. Holt, what information did you develop regarding Mr. Holt's role?
A. Mr. Holt at that point in time when the investigation started, and up until approximately, I would say, just a couple of months ago, Mr. Holt acted as Mr. Gerry's principal distributor. Mr. Holt actually lived in the residence with Mr. Gerry, are resided in the bedroom of the house where the drugs were normally kept and stored. And Mr. Holt acted as the subject who would meet with individuals when they came to the house and actually deliver to them the narcotics and take the money.
Q. All right. With regard to Mr. Holt, shifting topics just a minute, directing your attention, sir, to the course and plan to talk about a lady named Robin Berthelot who was arrested on February 27, 2009, are you familiar with the circumstances that led to her arrest?

A. Yes, sir, I am.
Q. Let's talk about -- Why don't you explain how it was that she was arrested and what was found on her.
A. Basically, on February the 27th, 2009, we initiated surveillance at Mr. Gerry's residence located at 2116 San Fernando, Bedford, Texas. We observed a black Toyota 4Runner at the residence we had previously identified as the vehicle normally operated by Robin Berthelot.
Ms. Berthelot had also been identified previously in this investigation as a sub-distributor for Mr. Gerry, meaning that she would purchase or receive quantities of narcotics from him and she would take those narcotics and distribute them to her own customers. And then if the narcotics had been fronted as a course of that, she would then return the portion owed to Mr. Gerry and obtain other narcotics.
On this particular day we had surveillance on Mr. Gerry's residence. When Ms. Berthelot departed from there we maintained surveillance on her. She arrived at the Waldemar Apartments located in Haltom City. We previously identified this apartment as the apartment belonging to one of Ms. Berthelot's associates subsequently identified as Melinda Henderson.
At that apartment Ms. Berthelot entered that residence. We observed her speaking with Ms. Henderson and another female who we did not -- were unable to identify. And we contacted

the Haltom City Police Department and asked for their assistance because the plan that was formulated was that when Ms. Berthelot left the residence we would attempt through the Haltom City Police Department to affect a traffic stop on them.

This plan came to fruition as Ms. Berthelot left. She ultimately noticed the Haltom City police officer, took some evasive action to avoid him, but ultimately as she was attempting to return back to the apartments, the Haltom City police officer was able to initiate a traffic stop.

Ms. Berthelot was ultimately arrested during that traffic stop, and a search of the vehicle revealed three separate packages of methamphetamine in the vehicle which amounted to approximately $260.

Q. All right, sir. And was it -- What kind of purity was it?

A. As I mentioned there were three separate packages of methamphetamine. This purity ranged from 95 percent pure to as high as 98.2 percent, I believe.

Q. All right. And during the course of this investigation, as of last Thursday, was Ms. Berthelot interviewed?

A. Yes, sir, she was. Following her arrest a post-arrest interview was conducted of Ms. Berthelot.

Q. And have you talked to the officer that conducted that interview?

A. Yes, sir, I have.
Q. And with respect to Ms. Berthelot, what did Ms. Berthelot say was the nature and extent of her drug dealings with Mr. Gerry and Mr. Holt?
A. Ms. Berthelot advised the interviewing agents that she had been involved with Mr. Gerry and his organization. She identified Mr. Gerry as the head of this organization, and identified Mr. Holt, another individual who has been arrested by the name of Steve Adams, and Mr. Gerry's daughter Robin Krambeck as his principal distributors.
Ms. Berthelot advised those agents that she had dealt with Mr. Gerry's organization and his distributors, primarily Mr. Holt, for a period of approximately 9 to 12 months. She stated that recently she began severing ties with them and she would obtain methamphetamine from other individuals.
Ms. Berthelot stated in this 9 to 12 months that she had dealt almost exclusively with Mr. Holt and then a woman that delivered the narcotics to her, and she obtained approximately four ounces per week during that period of time.
Q. Ten or twelve pounds?
A. I believe it is approximately 12 pounds.
Q. All right. Now, with regard to the investigation, you all have intercepted both wire and electronic communications on some telephones pursuant to court authorization.
A. That is correct.

Q. All right. In the -- With regard to -- I am sorry. I will try to stay on one subject. With regard to Mr. Holt there was an incident mentioned on March 23rd involving Lydia Kaye Cedillo and Gabriel Hernandez and Mr. Holt. Can you just summarize what the investigation showed that day?

A. Yes, sir. On March the 23rd, 2009, this was another day we established surveillance at Mr. Gerry's residence. During that surveillance we observed John Holt depart from the residence driving a black Mustang which at one point in time had belonged to another principal distributor of Mr. Gerry and was subsequently changed -- the vehicle title was changed in the name of Ms. Krambeck's paramour Wade Smith.

We followed Mr. Holt who departed from that residence and traveled to a nearby sports bar located on Highway 183. At that location with her Mr. Holt meets with a female and a male in the parking lot and then all of them proceeded inside the bar. We were ultimately able to later identify those individuals as Lydia Faye Cedillo and Gabriel Hernandez.

After they had been in the bar for some period of time, all the parties came outside and we watched Ms. Cedillo and Mr. Hernandez go to one vehicle and watched Ms. Cedillo retrieve some items which appeared to possibly be books out of the vehicle while Mr. Holt walked to the Mustang. Mr. Holt walked to the front of the Mustang and opened the hood of the vehicle while Ms. Cedillo placed those unknown items in the

passenger side.

She briefly walked up to the hood and spoke to Mr. Holt, and then both Mr. Holt and Ms. Cedillo got into the vehicle. They stayed there a short period of time, and then Ms. Cedillo exited the vehicle, got back in the vehicle with Mr. Hernandez, and departed.

Mr. Holt ultimately returned back to Mr. Gerry's residence there in Bedford and we maintained surveillance on Ms. Cedillo and Mr. Hernandez.

In coordination with the Arlington Police Department, those individuals were stopped in the area of I-20 and Great Southwest Parkway. Both suspects were -- pursuant to a warrant check were found to have outstanding warrants for their arrest.

A search of the vehicle revealed a quantity of methamphetamine hidden in a false compartment of a two liter Dr. Pepper bottle.

Q. That is about eight grams or so?

A. Yes, sir.

Q. All right. Let's talk for a few minutes about the relationship between Thomas Gerry and, you know, Mr. Herbert Anderson. What was the -- What did you learn in the investigation about the relationship between these two people?

A. Mr. Gerry and Mr. Anderson dates back -- Their relationship dates back for years, all the way prior to

Mr. Gerry's previous incarceration. Mr. Gerry has worked for Mr. Anderson for an extended period of time, I think both prior to Mr. Gerry's previous incarceration and as well as after he had initially got out of incarceration.

We have been told and received information that Mr. Gerry acts as a silent partner in the two adult entertainment businesses which Mr. Anderson owns and operates, Peeping Tom's and Hardbodies operated on Abrams in Arlington.

We have also noticed Mr. Anderson present at Mr. Gerry's residence on numerous occasions, and as well as Mr. Gerry present at Mr. Anderson's residence.

Q. All right, sir. Let's jump in and let's just start. June 5th, 2009, there are a series of communications between Mr. Gerry and Mr. Anderson about money.

A. That is correct.

Q. Tell us what the investigation showed in relation to those communications.

A. During our Title III court-authorized intercept on June the 5th, 2009, we intercepted a series of text messages and phone calls in between Mr. Anderson and Mr. Gerry. These phone calls in summary basically related that Mr. Anderson had contacted Mr. Gerry and was needing money. He ultimately described to Mr. Gerry that these funds were -- They say that he needed approximately $300,000 to purchase the building which the topless bar Hardbodies is located at and he was

trying to purchase this from the IRS, and it was something that he needed the money immediately. Mr. Anderson, in this series of messages and ultimately a phone call, asked Mr. Gerry exactly how much money he had and how much money he could put his hands on immediately. Mr. Gerry told Mr. Anderson that he had somewhere between $30,000 and $50,000 there at the residence, and then he had somewhere between $130,000 and $150,000 at a residence down the street, which was subsequently identified as his sister and brother-in-law's residence.

Mr. Anderson instructed Mr. Gerry to try to get as much money as he could and to bring that money to his residence.

Q. All right. You all then surveilled Mr. Gerry's residence?

A. Yes, sir. We actually had several surveillances going on at the same time, but surveillance was established at Mr. Gerry's residence along with surveillance was established on Mr. Gerry's daughter Brittany Krambeck.

Ms. Krambeck was followed over to Mr. Gerry's residence where she briefly entered the residence and spoke with Mr. Gerry, and then Mr. Gerry and Ms. Krambeck both came outside and stood on the porch and Mr. Gerry, we know from our Title III intercept, placed a phone call to a telephone. I forget exactly who it is subscribed to. I think it is subscribed to Mr. Gerry's sister Robin Krambeck. But the

phone was answered by a male whom we have subsequently identified as David Krambeck.

In that conversation Mr. Gerry told Mr. Krambeck that he was going to send Brittany down there, somewhat in code told her he was going to send her down there to clean off that shelf, and ultimately meaning that he was going to send her down there to pick up that money.

We watched Ms. Krambeck depart from Mr. Gerry's residence back down the street to the residence located -- the Krambeck residence which is located at 2136 San Fernando, just a few houses down. We watched Ms. Krambeck enter the residence, briefly stay, come back out, and go back to Mr. Gerry's residence where they went inside and initiated another phone call to Mr. Anderson.

During that conversation Mr. Gerry told Mr. Anderson that he was in possession of $160,000. And Mr. Anderson instructed Mr. Gerry to bring that to his residence.

We then maintained surveillance on Mr. Gerry and Ms. Krambeck as they departed from Mr. Gerry's residence in Ms. Krambeck's vehicle and traveled to Mr. Anderson's residence in Fort Worth located at 849 Oak Crest.

Q. All right. In the course of the investigation, particularly last Thursday, did agents of the Drug Enforcement Administration interview David Krambeck about those events?

A. Yes, sir, they did.

Q. And did he confirm to you all that he had in fact been holding money for Thomas Gerry at his residence and delivered it to Brittany?
A. Yes, sir, he did.
Q. And that was -- And this was not the only instance in which money had been picked up?
A. That is my understanding, sir.
Q. All right. Now, going on with the relationship between Mr. Anderson and Mr. Gerry, there are a series of transactions around June the 10th and 11th of 2009. Were there interceptions made regarding their relationship and what it is they are doing there?
A. Yes, sir, there were.
Q. Tell us about them, please.
A. Beginning on June the 10th, 2009 at approximately 10:55 p.m., we received a communication or we intercepted a communication between Mr. Gerry and Mr. Wade Smith, whom I previously identified as Brittany Krambeck's paramour. During that conversation Mr. Smith told Mr. Gerry that -- or asked Mr. Gerry what he was doing, and basically told him that they needed to come over, Brittany needed to come over and see him; that he had an opportunity that was basically too good to pass up. Mr. Gerry consented and advised that he would wait for her to get over there.

Surveillance passed by Mr. Gerry's house ultimately,

following that phone call, and observed Mr. Smith's vehicle parked in front of the residence.

Based on the conversation, it was also suspected that a narcotics transaction was possibly fixing to happen, so surveillance also passed by Ms. Krambeck and Mr. Smith's residence located in North Richland Hills. At that point in time a white Escalade that had never previously been observed at the residence was observed parked in the driveway.

Later on there was a series of calls or text messages -- I am sorry. Text messages, I believe between Mr. Gerry and Mr. Anderson following Mr. Smith's visit to his house. Mr. Gerry told Mr. Anderson in these text messages that he was going to need some of that money. We believed it was referring to some of the money that he had previously delivered to Mr. Anderson.

Mr. Anderson in the text message responded by telling -- asking -- telling him to come by and asking him how much he was going to need. Mr. Gerry initially told him that he would only need probably about $20,000, and Mr. Anderson told him to come on by.

There was also some communication between Mr. Gerry and Mr. Smith regarding how much Mr. Gerry ultimately paid for narcotics or normally paid for narcotics or methamphetamine.

There was some more communications back between Mr. Gerry and Mr. Anderson where Mr. Gerry decided first that he wanted

$30,000, and then apparently while he was en route to Mr. Anderson's house realized that he had forgot part of the money that he was needing and so he boosted it from $30,000 to $40,000.

And then ultimately later on that night there was a call between Mr. Smith and Mr. Gerry -- or not a call but a text message, which indicated that apparently the deal had happened and that Mr. Smith was pleasant that everything had worked out well.

Q. All right, sir. Go ahead.

A. The transaction basically continued on into -- This was occurring in the early hours of June the 11th. On June the 11th during the day, during midday, around 2:40, there was some more conversations in between Mr. Gerry and Mr. Anderson, and it appeared that those same individuals would be meeting with Mr. Gerry and they were either possibly conducting another transaction or trying to complete the first transaction.

During that transaction surveillance was established on Mr. Gerry. We had intercepted communication that indicated that those individuals were at Mr. Gerry's residence. Surveillance was established upon his residence, and we ultimately observed Ms. Krambeck and two individuals who were identified as Rene Cruz and Juan Gloria Cruz, I believe, exit Mr. Gerry's residence and depart with Ms. Krambeck to a hotel.

One thing I forgot prior to that was that as those individuals were there, there was also a communication which indicated between Mr. Gerry and Mr. Anderson, I believe, that he was sending Brittany over to Mr. Anderson's residence to pick up some more money.

We actually established surveillance on Mr. Anderson's residence and observed Ms. Krambeck at the residence. They referred -- In those conversations I believe they referred to the box or the box of money.

We actually -- When Ms. Krambeck departed Mr. Gerry's residence we maintained surveillance on her, but she began initiating measures which seemed to indicate that she was trying to see if anybody was following her so we maintained stationary surveillance at Mr. Gerry's residence, and ultimately observed Ms. Krambeck arrive at the residence and actually carry in a cardboard box into the residence.

Following that incident, then we observed the Cruzes and Ms. Krambeck depart from the residence, and at Mr. Gerry's direction she was taking them to a hotel located -- I think that still might be in Fort Worth, but it is in the area of 360 and Trinity Boulevard. Ms. Krambeck, before taking them there, actually took the Cruzes to a Target parking lot where a white Escalade was parked. Two other individuals were waiting in that vehicle or waiting there at that business.

Four individuals, the Cruzes and two more, ultimately got

into the vehicle, and Ms. Krambeck then led them to the hotel over at Trinity and 360. The Cruzes basically stayed there long enough for Ms. Krambeck to depart and then they left from there.

Pursuant to our operational plan, as those individuals were in Arlington, Texas, we had a traffic stop initiated on them. One of the individuals, Rene Cruz, was found to have an outstanding warrant for his arrest.

Pursuant to a search of the vehicle we discovered some weapons, I believe a rifle and a handgun, along with approximately $60,800 in cash.

Q. All right, sir. And in the course of your investigation, have you had occasion to -- Have you had occasion to interview one of Mr. Gerry's fairly regular customers from Louisiana?

A. Yes, sir, I did.

Q. And that individual had purchased substantial quantities of methamphetamine from Mr. Gerry?

A. Multiple-pound quantities.

Q. In fact, he got stopped with --

A. Three pounds.

Q. Three pounds of methamphetamine?

A. Yes, sir.

Q. Did he talk to you all about the relationship -- what he observed the relationship between Mr. Gerry and Mr. Anderson?

A. Yes, sir, I believe so. I would have to review that

completely. But he told -- If I am not mistaken, he told us that Mr. Gerry was a partial owner, or he was led to believe by Mr. Gerry that he was a partial owner in some of those establishments, and that Mr. Anderson had participated -- had been present I believe on at least one occasion when Mr. -- that individual had came and picked up a large quantity of narcotics.

Q. All right, sir. In the -- In the course of the investigation, have you had occasion to interview persons about, and have been told about an argument between Mr. Anderson and Mr. Gerry about the way Mr. Gerry conducted his drug business?

A. Yes, sir. I have heard that from a couple of different sources.

Q. All right. And what -- From these different sources, have they all related essentially the same story?

A. Yes, sir, they have.

Q. And what is the information that you have regarding --

A. Initially when Mr. Gerry was released from the penitentiary, this ultimate -- after following his previous incarceration.

Q. January 2005 he is released?

A. Yes, sir. Mr. Gerry actually lived with Mr. Anderson at his residence there in Fort Worth on Oak Crest, I believe. Mr. Gerry was actually employed somewhat, or employed on paper

by Mr. Anderson, and relatively -- maintained his methamphetamine trafficking, if any, to a bare minimum.

As Mr. Gerry -- The longer he was out, Mr. Gerry began trafficking more and more methamphetamine. Mr. Gerry in these activities, after he had moved into the house there in Bedford, these activities basically became increasingly and increasingly more obvious. Mr. Gerry was being more obvious about what was going on. Traffic was coming in and out of his residence at all hours of the day and night. People were coming and going. Mr. Gerry had amassed lots of vehicles and things like that in front of the residence that just didn't look right.

My understanding of the argument was, was Mr. Gerry -- Mr. Anderson was chastising Mr. Gerry regarding his activities in the fact that he was being so obvious, basically that he was being stupid about the way he was doing business.

Q. He wasn't objecting to the business; just the stupid way it was being conducted?

A. That is correct.

Q. All right.

MR. SCHATTMAN: Your Honor, I pass the witness at this time.

THE COURT: Thank you, Mr. Schattman.

Mr. Belcher?

MR. BELCHER: We have no questions at this time,

Your Honor. Thank you.

THE COURT: Mr. Haley?

MR. HALEY: Thank you, Your Honor.

CROSS EXAMINATION

By Mr. Haley:

Q. I am sorry, Agent. What is your name again?

A. Sir, my name is Ronald Robinson.

Q. Okay. Agent Robinson, let me ask you this. With respect to Mr. Anderson, now, based upon what I have heard so far, have you, other than this individual that you say from Louisiana, has there been any other information that you received that Mr. Anderson himself have participated in any receipt of methamphetamine?

A. I have received information from several different sources, as well as personal observation during surveillance and other things that Mr. Anderson has been present when narcotics trafficking was going on at Mr. Gerry's residence, that being quantities of narcotics being received and/or quantities of narcotics being distributed.

Q. So you are saying yourself you have seen where he has been present where methamphetamine has been being received from Mr. Gerry?

A. I have been present on surveillance when Mr. Anderson was present at Mr. Gerry's residence when Mr. Gerry was receiving large quantities of methamphetamine.

Q. And do you know, based upon your surveillance, whether my client even knew that methamphetamine was being taken at that residence?

A. Yes, sir. Based on the intercepted calls from the Title III, there were numerous calls intercepted between your client and Mr. Gerry where Mr. Anderson and Mr. Gerry are talking more or less in code about methamphetamine trafficking and the fact that Mr. Gerry needs to be very, very careful about what he is doing and those types of conversations, which would indicate to me that Mr. Anderson was well aware of what was going on.

Q. And so that the Judge, you know -- because I know the Judge is listening to this very carefully, what I want to be sure of is that you are taking the position that this is what you believe based upon -- You don't know for a fact. You believe that is what the interpretations are. I am talking about specifically the chastising.

A. The chastising?

Q. Yes.

A. Are you referring to the information that we received from multiple sources about the argument? Is that what you are talking about, sir?

Q. Correct. Correct.

A. Yes, sir. That -- Well, that was what was told to me by those individuals.

Q. Okay. So you don't know how reliable that is. You ARE just going on that based upon what they told you. Fair?
A. Yes. But if I can clarify that, you know, that was just one part of the information that they told us. Many other parts of that information that they had told us have been verified from other sources or from our own investigation.
Q. Based upon any of the informants that you have had access to, or your surveillance yourself, have you seen my client in possession of any methamphetamine?
A. No, sir.
Q. And let me ask you this. Prior to the interception of the phone call where my client made a phone call to Mr. Gerry and was asking him to loan him some money so that he could buy -- you know, so he could pay on that -- on his establishment through IRS, do you remember that conversation?
A. Yes, sir.
Q. Prior to that incident, what information did you have regarding my client being involved -- allegedly involved in any drug dealing?
A. The information that we have received, which indicated was that Mr. Anderson and Mr. Gerry were -- Mr. Anderson ultimately owned the topless establishments, but that Mr. Gerry was a silent partner in those businesses and that Mr. Gerry -- that those businesses were being used to launder part of the drug proceeds.

We also have information and documentation that Mr. Gerry was receiving a paycheck from Tazman, Inc. which is Mr. Anderson's company that operates those topless establishments. We also know that Mr. Gerry was not working at those establishments.

Q. Okay. That is fine. Now, so that I am clear, then, you will agree that prior to Mr. Gerry going to prison he was employed by my client. Correct?

A. That is -- That is my understanding, sir.

Q. Okay. Now, prior to him going -- Prior to Mr. Gerry going to prison, you hadn't received any information that my client's businesses were illegal, had you?

MR. SCHATTMAN: Excuse me. Did you say prior to Mr. Gerry's last incarceration?

MR. HALEY: Correct.

MR. SCHATTMAN: He was -- This investigation didn't begin until last year.

MR. HALEY: Okay. That is fine. I understand where you are going. I will withdraw that question.

MR. SCHATTMAN: I am sorry, Judge.

Q. (BY MR. HALEY) You are further, then, aware that when Mr. Gerry was released from prison that he was paroled to my client's house based upon an investigation by, you know, the Board of Pardon and Parole to allow him to stay there. Is that fair?

A. That is my understanding, sir.
Q. Okay. And one of the requirements -- I mean, you pretty much are aware that he has to have a place to stay, and I am talking about Mr. Gerry, and he has to be employed. Correct?
A. That is correct.
Q. All right. Now, after that at some point Mr. Gerry moved on and got his own residence and his own place. Correct?
A. That is my understanding, sir.
Q. All right. Now, with respect to again my client, you stated that you haven't seen him yourself or have received any information -- Well, let me take that back. Have you received any information from any source that my client personally has been in possession of methamphetamine?
A. Yes, sir.
Q. And you have received that from some sources?
A. I received that during an interview recently, as a matter of fact.
Q. Okay. And --
A. If you would like me, I can clarify that.
Q. Sure. Go ahead.
A. We received information in a recent interview of a co-conspirator which indicated that at least on one occasion, to the knowledge of this co-conspirator, that Mr. Anderson delivered a bag -- That Mr. Gerry did not have any methamphetamine because customers were calling and wanting

methamphetamine and there was no methamphetamine at Mr. Gerry's residence.

Mr. Anderson arrived with a bag. Mr. Anderson and Mr. Gerry go into the back bedroom where narcotics are normally stored and kept in this residence.

Q. Okay.

A. Mr. Anderson comes back outside with money in his hand. Following that conversation -- Following that conversation and Mr. Anderson's departure, nobody else, my understanding, had arrived at the residence and Mr. Gerry had narcotics for sale.

Q. Okay. Do you know what capacity Mr. Gerry was employed with Mr. Anderson?

A. He was -- It is my understanding, and again I could be off on this and I would have to review this information --

MR. SCHATTMAN: Excuse me, Your Honor. There are two periods in which the agent has testified that at least there is paperwork indicating employment. One is prior to Mr. Gerry's last incarceration, and the other is since January 2005. And if Mr. Haley could just clarify which time period he is talking about --

MR. HALEY: Okay. Thank you.

MR. SCHATTMAN: -- in the question.

MR. HALEY: Thank you, Mr. Schattman.

Q. (BY MR. HALEY) To clarify that, I am talking about his employment after he was released from prison, after Mr. Gerry

was released from prison.

A. To be honest with you, Mr. Haley, I don't know what his capacity is following his most recent release. I don't know -- I just know, based on the documentation that I have observed, Mr. Gerry is receiving a check from that company. Previously -- previously it was my understanding that Mr. Gerry was employed as a -- for the business as a personal assistant.

Q. Okay. And it is not illegal to be employed as a personal assistant with anyone. Fair?

A. No, not that I know of. Well, I guess it would depend on what your assistant was doing.

Q. Well, I agree with that part. I agree with that part.

MR. HALEY: No further questions at this time.

THE COURT: Thank you.

Mr. Ottaway?

CROSS EXAMINATION

By Mr. Ottaway:

Q. Agent, is it true that Mr. Holt has no felony convictions that you know of?

A. Mr. Ottaway, to be honest, Mr. Holt has been arrested numerous times, but my understanding, I don't think he has ever been convicted. But some of those in my research of that I was unable to determine the disposition.

Q. Thank you.

MR. OTTAWAY: That is all the questions I have.

THE COURT: Anything further, Mr. Schattman?

MR. SCHATTMAN: Very briefly, Your Honor.

REDIRECT EXAMINATION

By Mr. Schattman:

Q. Mr. Robinson, the stuff about getting a paycheck and -- or at least being shown on the payroll at Tazman, is there any particular advantage to Mr. Gerry to be shown on somebody's payroll?

A. Yes, sir, there is.

Q. What is that?

A. As the counselor advised, pursuant to the regulations of parole, Mr. Gerry needs to be gainfully employed, and it is my understanding and what I had been told was that Mr. Gerry was shown to be employed by Mr. Anderson to satisfy that requirement, although he was not performing any duties.

Q. With regard to Mr. Anderson, have you -- Do you have any information that gives you concern about the risk that he would flee?

A. Do what, sir?

Q. Do you have any information about Mr. Anderson or his family, his assets, whatever, that would give you concerns about his being a risk of flight?

A. Yes, sir, I do.

Q. What is it?

A. During this investigation we have identified that Mr. Anderson's wife Elizabeth is a Mexican national. Also looking at I believe Mr. Anderson's credit card statements, it indicates that Mr. Anderson makes frequent trips or travels several times a year to Mexico. We have also received information that Mr. Anderson or his wife owns -- His family is from Mexico obviously, and that Mr. Anderson owns property in Mexico.

Q. All right. And is there something about that that -- Other than the fact that it is just some other company --

A. Yes, sir.

Q. -- that you have particular concern about?

A. In my experience dealing with Mexico and extradition processes is that if a person flees to Mexico and they are married to a Mexican national and/or own property down there, extradition, though possible, can prove very difficult and sometimes take years to accomplish.

MR. SCHATTMAN: That is all, Your Honor.

MR. HALEY: May I, Your Honor?

THE COURT: Yes, sir, you may.

RECROSS EXAMINATION

By Mr. Haley:

Q. Agent Robinson, let's talk about this fleeing of my client. First of all, just the fact that his wife is a

Mexican national does not necessarily mean he is going to go to Mexico when he has lived here all his life. Is that fair?
A. Well, yes, sir. It doesn't necessarily mean that, no, sir.
Q. Okay. And in terms of your investigation of my client, he has never -- You are aware he has never been convicted of a felony in this state or any other state. Is that correct?
A. No, sir.
Q. Nor has he been convicted of any felony in this United States. Is that correct?
A. That is correct.
Q. Further, as a part of your investigation of my client, you are aware that he has been a life-long citizen of the United States. Is that correct?
A. Yes, sir. As far as I know.
Q. And you know that he lives -- that he resides in Tarrant County and that -- Are you aware he takes care of his 71-year-old mother?
A. No, sir, I wasn't.
Q. Are you aware that his mother works for his business?
A. I was aware of that.
Q. Okay. And are you aware that he has a daughter that goes to school -- To our private schools here at Nolan. Are you familiar with that?
A. No, sir, I did not know that.

Q. You didn't investigate that part?
A. No, sir.
Q. Okay. Are you aware that -- So you are aware that his ties to Tarrant County are his mom, he has been here all his life, and that he has a daughter here that he takes care of?
A. Yes, sir.
Q. You are aware of that?
A. I agree.
Q. And you take that the fact that just because he has a wife that is a Mexican national, that he may flee. Is that what you are representing to this Court?
A. Are you asking me my opinion, sir?
Q. Yes.
A. In 20 years of working with the DEA I have seen some people do some strange things when they are charged with a crime of this gravity and especially of this depth. When a person is faced with possibly losing their freedom, especially a person like Mr. Anderson who is not accustomed to something like that, it can make a person do desperate things.
All I am trying to say and all I am trying to point out is that because Mr. Anderson does have ties to Mexico through his wife and the fact that he owns property down there, if he chose to do that it would be very difficult for us to get him back.
Q. Okay. And Agent Robinson, the fact that a person is

charged with a serious offense, even the death penalty, when they have the ability or hire their own lawyers to defend them, have family ties, that is also indicative of the fact that they might, if they are innocent of an offense, stand their ground and fight for their rights. Isn't that fair?
A. Absolutely, sir.
Q. Okay. And if this Court fashions certain guidelines to attempt to assure that a person does not flee, then that -- It could be acceptable with the Court. Is that fair?
A. Absolutely.
Q. And I need to just ask you one thing. What information do you have -- I am concerned. What information do you have that my client owns property in Mexico?
A. To be honest with you, sir, that was based on I believe, and I would have to go back and review, but I believe that was based on one of the interceptions, one of the calls between Mr. Gerry and Mr. Anderson. And during that conversation, during that conversation they were talking I believe about Mexico, and Mr. Gerry actually told Mr. Anderson that he was going to come down there and buy property right by him up on that hill.
Q. Okay. But buying property and owning property are two different scenarios. Would you agree with me on that?
A. Well, if you buy something you own it.
Q. Okay.

MR. SCHATTMAN: Your Honor?

THE COURT: Yes, sir.

MR. SCHATTMAN: Could I just talk to Mr. Haley for just a moment?

THE COURT: Yes, sir.

(Discussion off the record.)

Q. (BY MR. HALEY) Let me go back over that, Agent Robinson. I understand what you are saying now. You were prefacing that Gerry said he would buy property down there by my client?

A. Yes, sir.

Q. All right. But you have not done any investigation to find out for a fact that my client actually does not own property in Mexico. You haven't done that type of investigation, have you?

A. Not yet, sir.

Q. Okay. So that could have been -- could have been a misinterpretation of what you heard. Is that fair?

A. Absolutely.

Q. Okay. Now, with respect to my client's wife, you don't know whether her family actually owns property in Mexico since she is from there. Is that fair? My client's wife?

A. I am assuming that obviously -- and I am basing that obviously on the fact that Mr. Anderson and his wife frequently travel down to Mexico. And it is my understanding, based again on information I have received, that they are

going down there to visit family. So I assume that they own something down there.

Q. Okay. And again when you have -- The court a lot of times, and usually as a fact, takes your passport away from you once you are charged with an offense. Correct?

A. Yes, sir.

Q. Especially a federal offense. Correct?

A. Oh, I think that is a requirement. But that doesn't necessarily mean that somebody can't go to Mexico.

Q. No, I understand. That doesn't mean they can't go to Australia or any place else they want to go.

A. Correct.

Q. Thank you.

MR. HALEY: No further questions. Pass the witness, Your Honor.

MR. SCHATTMAN: Nothing further, Your Honor.

THE COURT: Thank you, Special Agent Robinson. You are excused as a witness.

MR. SCHATTMAN: The Government rests, Your Honor.

THE COURT: Very well.

Mr. Belcher?

MR. BELCHER: We have nothing further, Your Honor.

THE COURT: Mr. Haley?

MR. HALEY: Yes, Your Honor. I would like to call my client's mother to the stand. I mean, if it is appropriate

at this time.

THE COURT: It is appropriate at this time, Mr. Haley. Would you ask whoever you wish to call to please stand.

And Mr. Ottaway?

MR. OTTAWAY: We don't have any witnesses.

THE COURT: Okay.

MR. HALEY: I would like to call Frances Clough to the stand at this time.

THE COURT: Very well. Would you please raise your right hand to be sworn by the clerk?

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Thank you. Please come around and have a seat on the witness stand.

FRANCES CLOUGH,

Testified on direct examination by Mr. Haley as follows:

Q. Would you mind giving your name for the record, please? Go ahead.

A. Frances Clough.

Q. Okay. Ms. Clough, can you hear me?

A. Yes.

Q. Okay. Ms. Clough, what is your relationship to Mr. Anderson?

A. Son.

Q. He is your son?

A. Yes.
Q. Okay. Do you have any other children?
A. Yes, sir.
Q. How many children do you have?
A. I have one more.
Q. Okay. Now, just calm down a moment. You don't have to be too nervous.
A. Okay.
Q. This is not about you. This is about your son. Okay?
A. Okay.
Q. Now, tell us where you live, where you reside.
A. 3610 Fort Hunt.
Q. Okay. Is that in Arlington?
A. Yes, sir.
Q. Tarrant County?
A. Yes, sir.
Q. Where does your son reside?
A. At Oak Crest.
Q. Okay. And where is that located?
A. It is off Eastchase.
Q. Okay. Do you know how long he has been living there?
A. Over ten years now I think.
Q. Okay. How far is that from where you live?
A. Ten to twelve minutes.
Q. All right. Now, there is a company that your husband

owned he mansion Tazman Corporation. Correct?
A. Yes.
Q. Okay. And those businesses that we have heard talked about today deals with Peeping Toms, and what is the other one?
A. Hardbodies.
Q. Okay. And those are adult amusement companies. Correct?
A. Yes, sir.
Q. And how long has he ran those businesses?
A. Been there about 19 years.
Q. Nineteen years?
A. Almost 20.
Q. Okay. And he actually just runs -- Actually he has a lease where he leases and pays rent on that every month. Is that correct?
A. Yes, sir.
Q. And at some point he has been trying to buy that property over the years. Is that correct?
A. Yes, sir.
Q. Who supervises that place? Let's talk about who supervises Tazman Corporation.
A. Tim Corbett.
Q. Okay. How often does your son have contact with you?
A. Every day.
Q. Okay. And do you work for your son also?

A. Yes, sir.
Q. What do you do in the business?
A. Manage.
Q. Okay. Which --
A. Hardbodies.
Q. Hardbodies? All right. Now, does -- Do you have any health problems?
A. Just diabetes.
Q. Okay. Does your son assist you with that in terms of making sure you take your medication?
A. Every day.
Q. Okay. You said it in a way that he makes sure you take it. Correct?
A. Yes. Every night if I don't he calls.
Q. Okay. Because you are kind of reluctant sometimes in taking it. Correct?
A. Yes, sir.
Q. And you understand how serious it is to take your medication?
A. Yes, sir.
Q. Now, are you on the pills or do you take insulin?
A. I am on three pills a day.
Q. All right. Now, how about your son? Does he have any type of health problem?
A. Yes, sir. He is diabetic.

Q. And what else?
A. Sleep apnea. I don't know if I am saying it right.
Q. And?
A. And high blood pressure.
Q. And high blood pressure. Does he take medications for any of those?
A. Yes, sir.
Q. What type of medication does he take for sleep apnea?
A. He is on some kind of machine that lets him sleep at night.
Q. All right. And does it wake him up if he -- It kind of keeps him awake sometimes to make sure he doesn't --
A. Gets his breath, yes, sir.
Q. All right. Now, what about diabetes? What type of medication does he take for that?
A. He is on pills.
Q. Okay. And how often does he have to take it?
A. About at least twice a day.
Q. Okay. And high blood pressure, you stated?
A. Twice a day, pills.
Q. Okay. Have you all had to take any of this medication up to the jail where he is being incarcerated at this time?
A. No. They said that they gave it to him.
Q. Okay. Is he on any type of insulin?
A. Yes, sir. They have been shooting him in the stomach, he

said.
Q. Okay. Is -- Are they shooting him in the stomach with the insulin for the diabetes, or are they just not giving him his pills?
A. They are shooting him in the stomach for the diabetes.
Q. Okay. How old is your son?
A. Forty-three.
Q. Where was he born?
A. Where?
Q. Where was he born, yes.
A. He was in Cincinnati, Ohio.
Q. All right. Does he have any ties to Ohio at this time?
A. No.
Q. All right. Does anyone else live with you other than yourself?
A. No.
Q. Okay. Has your son had any heart attacks?
A. Yeah, he has had a couple. I don't -- I can't say the word.
Q. About two or three?
A. Yeah.
Q. All right. How is he doing -- When was the last one he had, that you are aware of?
A. About four years now.
Q. Okay. All right. Is he trying to take care of his

health pretty much?
A. Yeah. Here lately he has been sort of sickly.
Q. Okay. Now, does he have a daughter?
A. Yes, he does.
Q. Okay. And how old is she?
A. She is 16.
Q. And where does she go to school?
A. She goes right up the road from where he is at.
Q. Okay.
A. She goes to Nolan.
Q. She goes to Nolan. Okay. And that is a private school. Is that correct?
A. Yes, sir.
Q. And is he paying that?
A. Yes, sir.
Q. How is she doing in school?
A. She is doing excellent.
Q. Tell the Judge what his relationship is -- We know what his relationship with you is every day. What is his relationship with his daughter?
A. Well, up to this year he had taken her to school every day last year, gets up, feeds her breakfast, they have a talk. This isn't really a daughter and father. This is -- They are really that close.
Q. Okay. And I am going to be sure now, the closeness has

to do also with the fact that he actually raises her, not the mom. Correct?
A. Exactly.
Q. She lives with him.
A. Yes.
Q. Okay.
A. He is the mom and dad.
Q. And with that relationship do they participate in any type -- Does he take her to any type of sport activities -- I am trying to figure out this relationship with his daughter, how close they are?
A. Yes, he does. He takes her just about anything. And last year he took her, because she just turned 16, so she finally got a car, she paid her own insurance. She is a very reliable 16-year-old girl.
Q. Okay.
A. And loves her daddy.
Q. Now, who is she staying with since the --
A. She is staying with her real mother.
Q. Okay. Now, let's talk about, do you feel that -- Also here present with us is Dr. Bill Puryear. Correct?
A. Yes, sir.
Q. That's a family doctor. Correct?
A. Yes, sir.
Q. I am not going to put him on, but he is here in support

of your son. Correct?
A. Yes, sir.
Q. And also there is another family friend here, Charles Beavers. Is that correct?
A. Yes, sir.
Q. And he is a businessman here in the city. Correct?
A. Yes, sir.
Q. Actually he is in the bail bonds business. Am I correct?
A. Yes, sir.
Q. And he is here in support of the family also. Correct?
A. Yes, sir.
Q. And of course John White is here. He is the family lawyer. Correct?
A. For years, yes, sir.
Q. For years. Right. Now, if the Judge were to consider allowing Mr. Anderson to be on bond, do you think he would be a threat to the community?
A. Oh, no, sir.
Q. And why would you say that?
A. I have been around a lot of people, but my son is strictly against any kind of drugs or smoking cigarettes. His house, he won't allow no one to smoke cigarettes or nothing in his house. And I don't think he is a threat to anyone.
Q. Okay. Well, to your knowledge over the years, has your son ever been convicted of a felony in this state or any other

state?
A. No, sir.
Q. Has your son been convicted of any felony in our U.S. federal courts?
A. No, sir.
Q. Now, with respect to whether or not he would flee this community, he has ties to the community through you as his mom. Correct?
A. Yes, sir.
Q. He has been here most of his life. Correct?
A. Yes, sir.
Q. Has he lived any place else other than Texas?
A. No -- Well, in Ohio when we was up there.
Q. Okay. How long ago was that?
A. Oh, it has been 20 -- Up to about six years old.
Q. Okay. So he has been here since he has been six?
A. Yes, sir.
Q. Okay. Now, with respect to -- And he has his daughter that he loves. Correct?
A. Yes, sir.
Q. And he has his business. Correct?
A. Yes, sir.
Q. And that business is a very successful business for the last 19 years. Correct?
A. Yes, sir.

Q. In fact, in terms of how legitimate his business is, there have been issues with the City, with ordnances and things like that, and paying his bills and his taxes. Correct?
A. Yes, sir.
Q. And when the laws changed with respect to adult businesses, he has accommodated that by following the law. Is that correct?
A. Yes, sir.
Q. Are you familiar with any raids upon his business with respect to improper drug use or anything like that?
A. No, sir.
Q. And there are certain agencies that oversee adult businesses. Correct?
A. Yes, sir.
Q. And you have been there when they have come and did their investigation to make sure everything was correct.
A. Yes, sir.
Q. I am just going to ask you because you said that you are the manager of at least one of those businesses. Have there been any drug dealing in those businesses that are related to your son, that you are aware of?
A. No, sir.
Q. Now, with --
MR. HALEY: Would the Court indulge me just one

second, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. HALEY) Now, my understanding is that DEA I guess came into the business last week. There was no drugs or anything found in that business. Am I correct? Well, let me ask you a question. DEA came into the business sometime last week. I am talking about the Drug Enforcement Agency. Correct?

A. Okay. Yes, sir.

Q. Now, did they find anything in that business illegal?

A. No, sir.

Q. They went in both businesses. Correct?

A. Yes, sir.

Q. Now, with respect to whether or not he would be a flight -- you know, a flight risk, if the Judge assessed a bond for him -- Now, who is he married to? Is his wife present?

A. Yes, sir.

Q. What is her name?

A. Elizabeth.

Q. Okay. Does Elizabeth speak English?

A. Yes, sir.

Q. A little bit?

A. Yes.

Q. Okay. Now, does -- How often does -- How often has your

son, to your knowledge, visited Mexico as a part of the family?

A. I don't really -- I can't say how many times. It is not that many. It is when her daughter is down there and they have something going, like her birthday, they do a 15-year-old birthday, and then her mother was sick once. They recently went -- Because I think her daughter turned 15 years old, so they went down there for the weekend.

Q. Right.

A. But not that often, because he really don't leave his dogs and things like that that long.

Q. His dogs here?

A. His dogs.

Q. Okay. Now, with respect -- Are you aware of any other places that he has gone outside the United States that normally people do that are not in trouble? Any other places?

A. No, sir.

Q. All right. Do you know whether or not your son as a part of your knowing his business whether or not he owns property in Mexico?

A. No, sir.

Q. Okay. Now, as a part of what you know, does his wife own property -- Does his wife's family own property in Mexico?

A. No, sir; not that I know of.

Q. Not that you know of. Okay. All right. If the Judge

set a personal recognizance bond or a cash bond of some type or security bond of some type, do you think that he would show up to court and defend himself?

A. Positively.

Q. Okay. And you all came into my office and retained me to represent him and make sure of that. Correct?

A. Yes, sir.

Q. All right. So based upon what he has here in the community, his ties to the community, do you see any reason why he would leave this country and not come back?

A. No, sir.

Q. Do you know whether or not Gerry, Thomas Gerry has any financial connection to the business?

A. No, he doesn't.

Q. Okay. And I mean, is he a partner? Is he a silent partner? If he is a silent partner let us know now.

A. No, sir. He has never had anything to do with it. I met Gerry years ago. My son met him years ago. He has been incarcerated, and my son has just always been his friend. And he did try to get him to stay clean. I know that for a fact. And Gerry knows how I feel about his drugs. I just -- No, he doesn't own anything.

And at the time when Gerry went in, he didn't have any money, and my son has worked hard for those two clubs. I mean, and I have been there for -- ever since it has been

opened, and I know who owns what.

Q. All right. And with respect to Special Agent Robinson talking about the hearsay that he heard about this dispute with your son challenging Gerry about his activities. Correct?

A. Yes, sir.

Q. Now, is your -- Am I understanding from you that your son confronted Gerry because he is trying to make sure that Gerry stays clean?

A. Yes, sir.

Q. All right.

MR. HALEY: Nothing further, Your Honor. Pass the witness.

CROSS EXAMINATION

By Mr. Schattman:

Q. Do you pronounce your name Clough or Clough?

A. Clough.

Q. Clough. Sorry.

Ms. Clough, it is Tazman, Incorporated that owns --

A. Yes, sir.

Q. -- both Peeping Toms and Hardbodies?

A. Yes, sir.

Q. And what is Momz, M-O-M-Z, Inc.?

A. Well, that was going to be the name -- You know, they was going to change the name and that is what it was going to be,

Momz, which everyone there knows me as mom.
Q. That is what what was going to be?
A. We had no Momz.
Q. M-O-M-Z?
A. Uh-huh.
Q. And you are the director of that corporation?
A. Well, it never -- It never got out. Nothing became of it.
Q. Okay.
A. Momz.
Q. There is an assumed name certificate on file in Tarrant County saying that Hardbodies is owned and operated by this M-O-M-Z, Momz.
A. Not that I know of.
Q. You said that you don't know of any instances in which drugs have ever been found or there has ever been a raid or where the police have come in to either Hardbodies or Tazman -- Either Hardbodies or Peeping Toms?
A. No. They did -- Well, I didn't understand the initials, but I -- The SWAT team as I know them, they came in one time at Hardbodies last year.
Q. Found some drugs there?
A. Not on -- No, not in the property. It is on private people that was working there. They never found anything in the property: They went through the whole thing again.

Q. Just some of the people that work there --
A. Two people.
Q. Just some of the people that worked at Hardbodies had drugs on them?
A. They had grass.
Q. Uh-huh. And some Extacy?
A. I don't know about that. All I heard about was there was grass.
Q. All right.

MR. SCHATTMAN: That is all.

MR. HALEY: May I, Your Honor?

THE COURT: Yes, sir.

MR. HALEY: Just very shortly.

REDIRECT EXAMINATION

By Mr. Haley:

Q. This raid that he is talking about, basically you used the word grass. That is -- You are talking about marijuana?
A. Yes, sir.
Q. Okay. And if any other drugs was found on some of the people you might just not -- You might not know what it was. Correct?
A. Right.
Q. Okay. And with respect to that, it was customers. Correct?
A. Yes.

Q. And then as you stated, there was a few employees.
A. Yes.
Q. Okay. Now, let's clear up for just one moment the issue with Momz, Inc. Okay? All right. Now, Momz, Inc. was a proposed name change of the company. Correct?
A. Yes, sir.
Q. And you went down and filed the necessary papers with the State.
A. Yes, sir.
Q. That have to be filed --
A. Okay.
Q. -- in preparation of that.
A. Yes, sir.
Q. Is that fair? But let's make sure that the Court is aware. Nothing ever went forward after that --
A. That is what I meant.
Q. Is that correct? So nothing was ever done. The company is still in the name of Hardbodies?
A. Yes, sir.
Q. Or Tazman Corporation?
A. Yes, sir.
Q. Is that fair? But those papers were filed because legally to get started you have to file papers?
A. Yes, sir.
Q. Okay.

MR. HALEY: Nothing further. Pass the witness, Your Honor.

THE COURT: Thank you, Ms. Clough. You are excused as a witness. Please watch your step.

MR. HALEY: Nothing further from myself and my client, Your Honor.

THE COURT: Thank you, Mr. Haley.

Mr. Ottaway?

MR. OTTAWAY: We have nothing further.

THE COURT: Very well.

Mr. Schattman, does the Government wish to be heard in argument?

MR. SCHATTMAN: No, Your Honor. We believe we have made our case and ask the Court to detain the Defendant.

THE COURT: Very well.

Mr. Belcher?

MR. BELCHER: We have no argument at this time, Your Honor.

THE COURT: Mr. Haley?

MR. HALEY: Yes, Your Honor. Just shortly.

Your Honor, I would ask the Court -- Obviously you are going to be looking at the Probation officer's recommendation, but also, Your Honor, I just very surely ask the Court to take into consideration that my client is a businessman. It is not illegal, unfortunately, to know different individuals that may

be doing wrong, but I mean, if they are even doing wrong -- But my point is that he is not a threat of flight just because he is married to a Mexican national. He is married to that individual, and as the Court is fully aware, you have the right when you are married to somebody to go visit in that country. They have taken his passport from him. We will not be going anywhere. He has hired counsel to defend him.

Secondly, I submit to the Court that with respect to his ties to the community, obviously we have been here all our life since we were six years old. We run a very successful business here in this community, Your Honor, very successful.

And then obviously his mom and his daughter that he is closely tied to. There is no reason for him to leave. He is tied to the community.

And in terms of being a threat to this community, I would submit to the Court that up until the Government, as they say, last year got some piece of information, which the Court has heard and can consider, but it is all about hearsay, Your Honor. I think that given an opportunity to defend ourself you will hear that the hearsay will not pan out to what it has been said to be because it is hearsay. Nothing -- Even the agents have said they have never seen him himself with anything illegal.

Now, he may have had conversations. Those conversations might be misinterpreted. But I am asking the Court to allow

him a personal recognizance bond, as recommended by the Probation Department. Thank you.

THE COURT: Thank you, Mr. Haley.

Mr. Ottaway?

MR. OTTAWAY: We just refer the Court to the Pretrial Services report and ask for that.

THE COURT: Very well.

I do find probable cause to believe that the Defendant has committed the offense alleged in the criminal complaint. And the Government has moved to detain. And with regard to Mr. Gerry, they raise two presumptions, and with regard to the other Defendants they raise a presumption that this is a drug offense punishable by more than ten years in prison, which means that the presumption is they are a risk of non-appearance and a danger to others. And under the circumstances I do not find that those presumptions are overcome.

With regard to the Defendant Holt, part of that failure to find the overcoming of the presumption results from, although minor, long-standing substance abuse issues in your record going back to age 17.

In any event, therefore, I will order the Defendants be detained pending further court proceedings.

I had some other matters set for 10:30. We will have to have a brief recess between these hearings and the next set,

but if you are involved in the coming hearings, please hang around because we will be right back in court.

So we are in recess.

(End of hearing.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts 09/05/2009

______________________________DATE______________

SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER